## NEW ORLEANS BANK & TRUST CO. v. HART.

Circuit Court of Appeals, Fifth Circuit.
May 10, 1929.

Rehearing Denied June 5, 1929.

No. 5500.

Henry P. Dart, Jr., of New Orleans, La. (Dart & Dart, of New Orleans, La., on the brief), for appellant.

Monte M. Lemann and Nicholas Callan, both of New Orleans, La. (Monroe & Lemann, of New Orleans, La., on the brief), for appellee.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge. Pere Marquette Building Company (hereinafter called the Building Company), a corporation organized under the laws of the state of Delaware, erected an office building upon certain property situated at the corner of Common and Baronne streets, in the city of New Orleans. The ground or lot upon which it was constructed belonged to the Societe Catholique, a religious organization, and the Building Company was the holder thereon of a long-term lease, with rent payable semiannually on the 1st of April and October. On September 15, 1925, the Building Company executed in favor of Strauss Trust Company of Chicago, as trustee, a mortgage covering the lease, the building and improvements to be erected thereon and all other appurtenances, including "rents, issues and profits." This mortgage secured $1,600,000 of first mortgage bonds bearing interest at the rate of 6¼ per cent. payable on the 15th of March and September of each year, which were negotiated for funds to erect the office building. The bond mortgage provided, among other things, as follows:

"In case default shall be made in the due and punctual payment of any rent, taxes, assessments, insurance premiums or any other charges or payments required to be made by the Lessee under said Lease, or any part thereof, or in case any other default is made by the Lessee under the terms of said Lease, and such default shall continue for a period of thirty (30) days, without any notice to said Mortgagor whatsoever, or if any default shall be made in the payment of the principal or of any interest or income tax payment on any of said bonds, or in the due observance and performance of any covenant or condition whatsoever in this Mortgage required to be kept or performed by the mortgagor, and any such default shall continue for a period of thirty (30) days, after written notice thereof to the mortgagor by the Trustee or to the mortgagor and the Trustee by the holders of not less than twenty-five per cent (25%) in principal amount of the bonds hereby secured and then outstanding, or in case an order shall be made for the appointment of a receiver for the mortgagor (unless such appointment shall have been provoked by the Trustee or the bondholders to enforce some provision of this mortgage) or for the seizure of the mortgaged property or a substantial part thereof, and such order shall not be vacated or suspensively appealed from within thirty days, or if appealed from shall be affirmed, or in case a writ of execution against the mortgaged property or a substantial part thereof shall be issued and shall not be vacated or recalled within ten days and in any event in ample time to prevent an execution sale, or in case the mortgagor shall be adjudicated a bankrupt and such ad-

722

judication shall not be suspensively appealed from within thirty days or such shorter period as may be allowed by law, or if appealed from shall be affirmed, then and in any such case the Trustee, in its discretion, and without any action on the part of any bondholder may and upon the written request of the holders of not less than twenty-five per cent (25%) in principal amount of the bonds then outstanding, shall, or in case of its refusal or failure so to act within thirty (30) days after such request, the holders of not less than twenty-five per cent (25%) in principal amount of said bonds may, declare the principal of all bonds thereby secured and then outstanding to be due and payable immediately, and upon such declaration the said principal, together with the interest accrued thereon, shall become and be due and payable immediately, at the place of payment aforesaid, anything in this mortgage or in said bonds to the contrary notwithstanding."

It also stipulated that:

"Until some default shall have been made in the payment of the principal or of interest on the bonds hereby secured, or of some part thereof, or in the performance or observance of some covenant or condition to be kept by the mortgagor under this mortgage, or under said lease, and until such default shall have continued after notice, if any, as provided in Article VII hereof, the mortgagor shall be suffered and permitted to retain actual possession of all the premises, properties and assets of every kind and character hereinbefore described and to manage, operate, use and enjoy the same and every part thereof, with the rights appertaining thereto, and to collect, receive, take, use and enjoy the earnings, income, rents, issues and profits thereof."

On December 9, 1925, a second mortgage in the sum of $300,000, with similar provisions, was placed upon the same property, with the New Orleans Bank & Trust Company as trustee.

Thereafter, on September 24, 1926, the Building Company borrowed from the New Orleans Bank & Trust Company the sum of $25,000 for which it gave its 90-day note, bearing 6 per cent. interest, and to secure this loan the parties simultaneously executed an act of hypothecation and pledge, the pertinent provisions of which are as follows:

"Now, therefore, in order to secure the due payment of said note, or any renewal or renewals thereon, in principal and interest, according to its tenor and effect, the undersigned, Pere Marquette Building Company, has assigned, transferred, set over and delivered in pledge and pawn, and by these presents does hereby assign, transfer and deliver in pledge and pawn, to said New Orleans Bank & Trust Company all those certain rents due and payable to it as Lessor under leases, executed by the persons named in the schedule hereto annexed and identified herewith, for premises in the Pere Marquette Building, becoming due and payable for the calendar year commencing October 1, 1926. This assignment, transfer and delivery in pledge is made upon and is subject to the following conditions:

"1. So long as the undersigned, Pere Marquette Building Company, be not in default in the due payment of the principal or interest of said note, or of any renewal or renewals, if any, thereof, New Orleans Bank & Trust Company will pay over to Pere Marquette Building Company, or to its order, all rents, from time to time accruing and received by it, so that so long as there shall be no such default, the undersigned, Pere Marquette Building Company, shall have full use and benefit of all such rents.

"2. All rents due the undersigned, Pere Marquette Building Company, shall be made payable by the terms of leases with its tenants at New Orleans Bank & Trust Company, and when received by New Orleans Bank & Trust Company shall be placed in a special account to be known as 'Pere Marquette Building Rental Account,' and upon request from time to time of the undersigned, Pere Marquette Building Company, New Orleans Bank & Trust Company (so long as there is no default in the due payment of the principal and interest of said note) will transfer all of said funds, or so much thereof as may be requested, to a general checking account of the undersigned, Pere Marquette Building Company, and all such money so transferred shall be free and clear of the pledge hereby created.

"3. In case default be made by the undersigned, Pere Marquette Building Company, in the due payment of the principal and/or interest of said note, or of any renewal thereof, New Orleans Bank & Trust Company is hereby authorized and empowered to apply all monies received by it from rents accruing monthly during said calendar year over and above the sum of Ten Thousand Eighty-three and 33/100 ($10,083.33) Dollars towards the payment of said note in principal and interest, it being the intent hereof that in any event the sum of Ten Thousand Eighty-three and 33/100 ($10,083.33) Dollars out of the amount of rents received by New Orleans Bank & Trust Company in each month

shall be paid over monthly to the Pere Marquette Building Company to enable it to have funds to pay accruing interest on its first and second mortgage bonds and that the surplus remaining shall be held in pledge for the payment of said note; in such event of default, the New Orleans Bank & Trust Company is further authorized to take such other steps or to do any other thing it may deem necessary for its protection in the premises not inconsistent with the provisions hereof."

Renewal notes for the full amount were given December 3, 1926, March 25, April 23, and May 24, 1927. Payments on principal and renewals were made as follows: June 29th $2,500 was paid and an extension given until July 5th; July 11th $1,500 was paid and the note extended to August 4th; and on August 5th $2,500 additional was paid and a new note given for the balance of $18,500 due September 2, 1927. The original and all renewal notes bore upon the backs thereof the notation:

"Secured by rent notes and leases held for collection as per pledge and assignment attached hereto."

On August 26, 1927, the New Orleans Bank & Trust Company sent to the tenants in the building the following notice:

"Under the terms of your lease with the Pere Marquette Building Co., the rents due are payable at this Bank and by instrument dated September 24, 1926, all of said rents were assigned and transferred to this Bank and this letter is intended as notice to you to that effect, and we request that said notes be paid to the undersigned as such assignee."

Subsequently the Building Company advised the tenants that the statement of the New Orleans Bank & Trust Company that all rents had been assigned to it was in error and notified them not to pay the bank, and on August 30th said bank sent to the tenants a further notice, reading as follows:

"Referring to our letter to you of date August 26, 1927, we further advise and notify you that all rents due and to become due by you under your lease with Pere Marquette Building Company have been pledged, assigned and transferred to us by said Company, and all payments should be made to us and to no other persons."

As a result some of the tenants paid the bank a total of $2,728, and others paid no one for the time being.

The New Orleans Bank & Trust Company was removed as trustee for the second mortgage bondholders, and the Whitney Central Trust & Savings Bank was substituted in its place.

On October 7, 1927, Mike S. Hart was appointed receiver of the property on the petition of Whitney Central Savings Bank & Trust Company, as trustee. An agreement was made without prejudice to all, whereby funds arising from the rents and revenues were placed in a special account sufficient to cover the claim of the New Orleans Bank & Trust Company, so as to remove the confusion arising from the conflicting notices to tenants as to whom they should pay.

Thereafter the receiver filed a depending and auxiliary bill, impleading the New Orleans Bank & Trust Company and the Whitney Central Trust & Savings Bank and praying that the former bank be decreed "without right to any of the rents collected by it or accruing from tenants of the Pere Marquette Building on or after September 1, 1927; directing and decreeing that all of the funds deposited in the special account set up in accordance with the order of court entered under date of October 7, 1927, to cover possible claims of the New Orleans Bank & Trust Company, be paid over to petitioner; directing and decreeing that New Orleans Bank & Trust Company should pay over to petitioner the amount of rents heretofore collected by it direct in the sum of $2728.00, with interest on each amount collected at the rate of five per cent per annum from the date of adjudication."

The matter was heard by the court and a decree rendered directing that the sum of $22,009.01 collected and deposited in the special account pursuant to the order of October 7th, all of which was found by the court to have been collected on or after October 7, 1927, together with accrued interest, to be paid over to the receiver. It was further decreed that the New Orleans Bank & Trust Company should pay over to the receiver all sums "which were not specifically pledged to the bank by written contract of September 24, 1926, said amount so collected being found by the court to amount to the sum of $757.50."

The New Orleans Bank & Trust Company alone has appealed.

The Building Company defaulted on the payment of the ground rent due to the Societe Catholique on April 1, 1927, and the trustee under the first bond mortgage paid the same, amounting to $50,000, with interest, to protect the rights of bondholders against forfeiture of the lease. On July 1, 1927, an agreement was entered into between the owners of the second mortgage bonds, the trustee under the first mortgage, and S. W. Strauss & Co., in which it was set forth that the

Building Company was in default and to avoid "immediate acceleration of the indebtedness secured by said first mortgage and the foreclosure thereof, in order that the said second mortgage bond holders may have a further opportunity of saving and preserving their security," the second bondholders should deposit all of their bonds with the Whitney Central Trust & Savings Bank, as the depository, subject to the terms of said agreement. It was further provided that if the second bondholders should reimburse the trustee under the first mortgage for all sums expended for ground rent and taxes, with interest, and should otherwise put the matter in good standing so as not to prejudice the rights of the first mortgage bondholders, by the 1st of October, 1927, the second mortgage bonds should be returned to their owners; otherwise the depository should hold said bonds in trust subject to the order of Monroe & Lemann, attorneys, for the benefit of the first mortgage trustee, to be used and disposed of by it, with the right to exercise all powers thereunder which the second bondholders or their trustee might do, including the right of foreclosure of said second mortgage and to apply the proceeds of the property to the satisfaction of defaults under the first mortgage, all in complete accordance with the rights of the parties under their respective contracts.

In consideration of the postponement of its rights under its first mortgage by the trustee thereof, and the deposit of the bonds aforesaid, it was further provided in paragraph 9 of said agreement, as follows:

"Ninth. All the parties hereto agree that no action will be taken by any of them looking to the foreclosure of said Second Mortgage prior to October 1, 1927, except with the consent in writing of at least not less than seventy-five per cent (75%) in amount of the bonds deposited hereunder; and the First Mortgage Trustee and the Bankers agree that in so far as they can control the situation there will be no acceleration of maturity nor foreclosure of the First Mortgage prior to said date."

From the above recital it is seen that the first mortgage bondholders through their trustee had a superior lien upon all of the property of the Building Company, including rents and revenues, but until default as to some of the obligations under the mortgage, the Building Company was "permitted to retain actual possession of the premises, properties and assets of every kind and character, * * * and to use and enjoy the same, * * * and to collect, receive, take, use and enjoy the earnings, income, rents, issues and profits thereof." The mortgagor failed to pay the ground rent due April 1, 1927, and under the terms of another article of the mortgage, 30 days thereafter, or on May 1st, was in default, at which time the mortgagee could have instituted foreclosure proceedings or taken other action putting an end to the right to use the rents and revenues. However, instead, it entered into the agreement of July 1, 1927, heretofore described, by which it waived that right and for the consideration therein named, bound itself not to take such action until October 1st. The Building Company was not a party to this arrangement, but the trustee of the first mortgage and all of the second mortgage bondholders were, and this had the effect of leaving the rents and revenues in the hands of the Building Company, at least until that date, as nothing seems to have been done to curtail that privilege prior to the disagreement which arose from the collection by the New Orleans Bank & Trust Company of the rents after it had sent its formal notice to the tenants of August 26, 1927. The bank was fully conversant with the extension granted the second bondholders, as it was trustee under that mortgage. The lower court held that the power of the Building Company under the first mortgage to exercise further control over the rents and revenues ceased with the appointment of the receiver on October 7, 1927, but allowed it to retain all sums collected from tenants specifically named in the contract of pledge of September 24, 1926. All sums collected on or after October 7th and the sum of $757.50 received before that date, which the court found was not specifically pledged, were held subject to the lien of the first mortgage and superior to the rights of the bank.

It seems reasonably clear that all persons dealing with the Building Company, including the appellant, were necessarily charged with notice of the terms of the first mortgage which covered the building, improvements, rents, and revenues, but permitted the mortgagor to possess, use, and collect such revenues so long as it was not in default. They were also bound to know that any violation of the terms of that mortgage, or failure to perform its material obligations, would have the effect of giving the mortgagee the right to put an end to such use by the Building Company. Therefore the bank, in taking its assignment or pledge of the rents and revenues, did so subject to that eventuality. To hold that the Building Company could pledge those revenues beyond such de-

fault would have the effect of nullifying the plain terms of the first mortgage, for if it could tie up the rents for one month beyond the default in the face of the mortgage, it could do so for ten years or more and thereby effectually destroy the rights of the first mortgage bondholders. It must be remembered that the security for this mortgage was the building and its revenues alone for the lot or land belonged to a third person. In fact, the original contract of pledge of September 24, 1926, did not purport to embrace anything more than "those certain rents due and payable * * * under leases executed by persons *named in the schedule hereto annexed and identified herewith* * * * becoming *due and payable for the calendar year commencing October 1, 1926."* Jones on Mortgages, § 1536; Black on Receivers (Alderson's Edition) p. 194; Donlon & Miller Mfg. Co. v. Connella, 89 Hun, 21, 34 N. Y. S. 1065; Lofsky v. Maujer, 3 Sandf. Ch. (N. Y.) 69; Wyckoff v. Scofield, 98 N. Y. 475; Gaynor v. Blewett, 82 Wis. 313, 52 N. W. 313, 33 Am. St. Rep. 47; Iroquois Brewing Co. v. Scarabello, 189 App. Div. 524, 179 N. Y. S. 213; New Way Bldg. Co. v. Mortimer Taft Bldg. Corp., 129 Misc. Rep. 170, 220 N. Y. S. 665; Colonial Trust Co. v. Stone Harbor Electric Light & Power Co. (D. C.) 280 F. 245; Fletcher v. McKeon, 71 App. Div. 278, 75 N. Y. S. 817; Townsend v. Payne & Co., 42 La. Ann. 909, 8 So. 626; Lamorere v. Cox, 32 La. Ann. 1045.

The bank has been by the lower court allowed to keep all sums received from those tenants named in the lease attached to this contract. Even as to these the bank agreed to transfer to the checking account of the Building Company "all of said funds or so much thereof as may be requested," so long as it was not in default upon the note representing the loan of $25,000; but "in any event $10,083.33 out of the amount of rents received * * * each month shall be paid over monthly to the Pere Marquette Building Company to enable it to have funds to pay accruing interest on its first and second mortgage bonds, and that the surplus remaining shall be held in pledge for the payment of said note."

Both the president of the New Orleans Bank & Trust Company and the chairman of the board of the Building Company testified that on the occasion of one or more of the renewals of the note, it was agreed that all of the rents collected by the bank should be pledged for its payment, but the original agreement was made by the president and chairman of the board of the Building Company formally authorized by the board of directors, and it cannot be assumed, in the absence of further proof, that the chairman of the board alone had the power to enlarge or extend this agreement so as to include rents or leases other than those originally named, especially in view of the repudiation and denial of that fact which the Building Company made promptly upon learning of the contention of the bank as a result of the notices sent to tenants on August 26th to pay the rents to the bank.

It is true that the bank relies upon the printed terms of the several note forms used both in the originals and renewals, but these provisions cannot prevail over the specific recitals of the special contract of pledge and the notation on the back of the note and each renewal thereof that it was "secured by rent notes and leases held for collection as per pledge and assignment attached hereto." Admittedly the document referred to was the original contract of September 24, 1926. The sum of $757.50 collected before October 7, 1927, which the lower court held should be returned to the receiver, arose from rentals collected of tenants not named in the list attached to the note, and we think were correctly excluded from funds which the bank could apply upon its note.

We are of the opinion that the judgment appealed from is correct, and it is therefore affirmed.